If it may please the Court, Paul Rossi for Appellant Roque De La Fuente. Justice Harlan explained in his concurring opinion in Williams v. Rhodes that the only legitimate interest that a state may invoke to require the collection of petition signatures to secure ballot access is the risk of ballot clutter and voter confusion. However, Justice Harlan also explained that eight candidates cannot be said to carry a significant danger of voter confusion. Appellant has produced the evidence, frankly the only evidence in this case, produced by Richard Wenger, which has been accepted and relied upon by district and circuit courts in Libertarian Party of Georgia and Graveline, that a requirement to collect 5,000 ballot signatures is sufficient to advance the state's minimal interest in a national election to prevent ballot clutter. Wenger's unrefuted evidence is sufficient for a reasonable trier of fact to find that California's signature requirements are unconstitutionally excessive. California itself has demonstrated that it is comfortable that its interest against ballot confusion is satisfied at a much lower signature requirement. Just in 2017, California reduced the signature requirement to get onto its primary ballot from 10,000 to 7,000 in lieu of a filing fee. You can get on the top two. California, you should probably know, has a top two primary system whereby the only way to make it to the general election is through the top two system in state elections. Every candidate pays the filing fee because nobody wants to get signatures. It's very difficult to go out and get signatures. But in that event, the legislature thought 10,000 was too many, even in the top two primary system where there are, I think your honors are aware, there's sometimes 10 and 20 candidates running for state office. It's hard to justify the state's argument that they're trying to prevent ballot clutter against independent presidential candidates by requiring them to secure 178,000. That number, by the way, in 2020 is going up to 196,000 signatures in a 105-day time period. The combined effect of the excessive signature total and the time frame, and we're primarily challenging the signature requirement, is unconstitutional. As Judge McEwen, as you wrote in your concurrence in Green Party, Anderson imposes a balancing test, a means and test. You've heard this from, at the prior case, you're well aware of this test. And it is not enough to simply point to Genes, because as the Sixth Circuit has suggested, as ruled, that Genes, when it was decided, applied a different framework and a less exacting framework than the current Anderson v. Celebrez test, which is a balancing test. It is an ends means. And the state has completely failed to show any evidence that they need the 178,000 signatures or 1% of the total voter registration to prevent ballot clutter when we produce evidence to the  And I think what you wanted to prove was a paraphrase of your statement. But you're arguing for strict scrutiny, in effect, correct? We are, Your Honor. But I would also suggest that even under the balancing test in Anderson, we would prevail, because... I know you have a lot to get over. Sorry, Your Honor. I just want to clarify this, because under the framework that you would like us to adopt on the strict scrutiny, isn't it your client's obligation to bear that burden? So you bear the burden, not the state in showing the ballot access restriction. But we are here on a motion for summary judgment, and we have produced evidence that ballot clutter has never occurred when states, with respect to independent presidential candidates, has never occurred at a 5,000 signature requirement or higher. Now, we're not suggesting that that's the remedy in this case. It's within the court's equitable discretion and ultimately the state legislature, when this law is held unconstitutional, to sort of reconfigure what the signature totals are, just as they did in lowering the 10,000 down to 7,000 for the primary top two system. But we're here on a motion for summary judgment, and we are arguing that the district court completely ignored the evidence produced by plaintiffs, by appellant in this case, showing that there's no ballot clutter above 5,000. We produce a voluminous record on that account. Only six independent presidential candidates have ever filed petitions of 5,000 or more. It's Rocky De La Fenta, Nader, Lenin LaRouche, although I hate to say that name. It's having about a half a dozen times in California. And in no case where a state has required independent presidential candidates to put forth 5,000 signatures as the modicum support standard has there ever been an instance where there's more than six candidates for the presidential election ballot. So there was a lot of talk in the last case about Genes. I would suggest that Anderson supplants Genes. The Sixth Circuit recognized that. And specifically with respect to independent presidential candidates, the test is somewhat different. It's a national election. Well, you know, the Supreme Court has said that we have to take in consideration property restrictions on the ballot so that it doesn't get confusing. Correct. Candidates have been able to do it under this, six of them, Ross Perot and a few other people. Doesn't that show that the measure can be done? And if it can be done, why doesn't, why can't they do it in order to limit the number of people and make the ballot in California more easy for us people who have to vote? Fair enough. But, Your Honor, the other standard announced by this circuit in Nader v. Brewer is that if there's a lack of independent, and this is important, because it's the independent presidential candidate, it's a class of candidates that must be allowed access to the ballot. You can't simply say, the State essentially argues, well, we allow a lot of little, a lot of the small parties and the major parties, that's enough when you look at the broad suite. But Nader v. Brewer said that if there's a lack of independent presidential candidates on the ballot, that's indicative that the actual effect of the signature total is unconstitutional. The youngest person in the State of California to ever have had an opportunity to vote for an independent presidential candidate is now 44 years old. 20% of the people who, because Ross Perot was the last independent presidential candidate to succeed in getting on the California ballot, based on the demographics of that election, assuming an average age and life expectancy of 100, 25% of those people who had the opportunity to vote for Ross Perot have now died without ever having had that time difference to demonstrate that the current formulation, the current signature requirement imposed by California, specifically against independent presidential candidates, is a severe burden on those candidates. Ross Perot was also a billionaire. I think you remember, Your Honor, he was on CNN every night. It's helpful if you have a lot of money. Correct. That's not, that's — The Court hasn't really talked about that very much, of the burden on the individual. They've talked about the burden on the ballot. Correct. And how would it fit in that the poor people can't be running for president of the United States? Would that sell to the United, to the Supreme Court? I agree. I think you don't need to be Ross Perot, you ought not to be Ross Perot or the guy that's going to be running in 2020 to make it onto the California ballot. You don't need to be a millionaire. If, constitutionally, you can't require that sum of money to get onto the ballot, which is what you need to be to get onto California. My plaintiff is very wealthy. I wish I had his resources. He has a $50 million trust fund. He controls a family. He made the decision because he had run in the Democratic primaries across the country. He was well aware of the cost and the difficulty and expenses to get onto the ballots. And when he saw California's 178,000 signature requirement, it was just too much to bear. And he decided, I'm going to focus my campaign on other states where I could get onto the ballot. And he did successfully in roughly 23 states. And it directly impairs the rights of voters, not only in California, but outside California. Look, I'm from Pennsylvania. I thank you for plucking me out of Pennsylvania in the middle of winter. I appreciate this oral argument at this time of the year. In Pennsylvania, when I cast a ballot, a vote for, I'm a partisan, but every once in a while I do cast ballots for independent candidates to send a message to my party, because that candidate may be advocating an agenda item that my party isn't representing, and that's the way to send a message to your political party. That's really the purpose that independent candidates serve, especially in the presidential election context. I have the right and hope that my vote isn't going to be completely wasted, because that agenda and that platform isn't provided by other states. California, in a presidential election, doesn't have the right to impair the election process for the entire country. It also goes, FEC funding, it's not matching funds, it's election funds, I was corrected on that the other day, requires 5% vote total across the country. If you're not on California's ballot, it's virtually impossible to meet that threshold. And that's part of the, that's part of what Congress has recognized to be the construct of a national election. It's our only national election, and independent candidates must be allowed to have access to all the state ballots on a reasonable basis, and that goes to ballot clutter. Yes, you must show a significant modicum of support, but that is, that modicum of support is directly tethered to the state's interest in avoiding ballot clutter. Our evidence shows ballot clutter doesn't occur above 5,000 signatures, and any surplusage, there's essentially from 6,000 to 178,000, the state doesn't have an interest in requiring that of independent presidential candidates. Again, I'm not suggesting that 5,000 is going to be the number for California. I think there's some room there. Pennsylvania requires 5,000 now. It was reduced under this same analysis. Pennsylvania's about one-fourth the size of California. Multiply that by 4, 20,000. Georgia is one-third the size, excuse me, Pennsylvania is one-third the size of California. Multiply that by 3, you get 15,000. Georgia's one-fourth the size of California. They are now down to 7,500 under this analysis, so you could get maybe 30,000 in California, but 178,000 is clearly excessive. Let me ask you about minority parties or small parties versus independent candidates, because we do have in California minority parties. Yes, you do. And so by the time you take the traditional majority parties and you add up the minority parties, you have a large percentage of the population, right? Yes, you do. And so the, it's, there is ballot access, but it might come in a different form. How do you analyze that? Because I don't think that strict scrutiny, I think that's a tough road to hoe here, as you probably recognize, and that it may really be the lesser. Well, even under the, even under the, I would agree, well, I would, obviously every attorney likes strict scrutiny, Your Honor, I'm certainly not going to ban that, but even under the balancing test, that surplusage doesn't have any state interest. So you get 0 percent versus any kind of First Amendment violation against the candidate or the voters, and the scale tips in our favor and we win under the balancing test. You are correct, there are smaller parties in California. In fact, you're going to hear that that's a rationale for simply casting independents aside. Storvie Brown specifically said it's important to allow independent presidential candidates on the ballot because you can't require independent candidates to give up the patina and the mantle of independence and marry to a political party that may not be a correct and proper fit. That's why the fact that there are minor parties in California on the ballot, you can't, it's not imposing this kind of severe restriction on independent candidates to essentially exclude them from the ballot and then force them to go to the minor parties is itself a constitutional impairment, and you can't, it strips the candidate of his independence, and that independence means something to voters, certainly means something to me. There are certain political parties, I don't care who the candidate was, I would never cast a ballot for, but I might consider an independent candidate because they are not tethered to the whole baggage that those other minor parties comes with. And I would also suggest that no new political party has qualified in California since I was elected. There's no, we're sort of stuck in this status quo, you get these, the minor parties that were qualified back in the 90s, you had the Republicans and Democrats, and no independents. That's not a constitutional scheme, and I'd like to reserve the balance of my time for rebuttal. Thank you. May it please the Court, I am Jonathan Eisenberg, Deputy Attorney General for California, Secretary of State Alex Padilla. Could you speak up a little more because the acoustics in here are not perfect. Is this better? That's better, thank you. The prior oral argument and the current oral argument has established that the Chamniss-Anderson -Burek framework is the appropriate framework to be analyzing this question under. Before you get into that, I have a preliminary question, which would obviate it, but there's an answer to it. Do you concede that De La Fuente has standing in California? We have not conceded that De La Fuente has standing, but I wasn't planning to. There's been no finding made by the district judge on that issue. It should have come up, and of course, you as in the opposition should have raised it. Was it discussed in the district court? I believe it was not. On the other hand, we are entitled to raise it at any time, and he has taken action. Well, let me go back. Part of this case was litigated by the District Court before the 2016 election was over, and there's no question that he had standing at that point. We're not contesting that, but now we're looking forward to 2020. He says he's going to run for president. Right. Again, I didn't want to make this a major point. I think he probably could have shown standing, but I was just surprised that it wasn't brought up in the district court to show the standing. That's a constitutional requirement to get in the federal court. At any rate, it wasn't discussed. It wasn't objected to, and we'll handle it from there. Exactly, because it is something that can be raised for the first time on appeal. The case has become a forward-looking case to the 2020 election, whereas it wasn't before. It even went up on appeal about the 2016 election previously. So, the Anderson-Burrett-Chamnes test requires the plaintiff to show the burden that he or she has suffered trying to get on the ballot. So, Mr. Rossi emphasizes something that isn't really about the burden. He emphasizes Mr. Winger's intuitive analysis about 5,000 votes. The facts are that Mr. De La Fuente did not even attempt to comply with these requirements, and he is alleging that it's a severe burden, but he put forward no evidence of what the burden was. So, we're left to look at the statute on its face objectively. Is this burden objectively a severe burden that would put the analysis into the area of strict scrutiny? And the answer is clearly no. Requiring an independent candidate to get on a general election ballot is appropriately a higher hurdle, right? The Monroe case talks about how the general election ballot should be reserved for major struggles among the candidates that the voters have already shown strong interest in. So, it's appropriate that there be a burden that's commensurate with that interest. One percent of the registered voters in the last general election, in the case of a presidential election, it'll always be a non-presidential election by which you draw the number of voters, is simply objectively reasonable. It's way, way below the number in the Genes case of 5 percent, which was also dealing with percent of registered voters. The idea that you would lower that number to 5,000, I mean, for the first time in oral argument, now they're saying 20,000. They said 99,000 in the briefing. The goal is not to make it as easy as possible for a candidate to get on the ballot. We are standing on the interest of winnowing the candidates as well as avoiding confusion. But, you know, the number that you have on there is hardly, at least on the presidential candidate, we haven't had a real ballot confusion overload. But we have had an absence of independent candidates. And I think that Mr. Rossi suggests that that absence, something can be read from the fact of that absence in terms of having too high of a threshold. So, I think that the State needs to answer that issue. Absolutely, Your Honor. I'm happy to do so. As Judge Wallace pointed out, six candidates have made the ballot under this law. Now, it hasn't happened recently, but it's happened. The 1 percent requirement was there. And in fact, the number of days that you had to gather the votes was shorter in the past. When was the last time we had an independent candidate? I believe it was Filani. It's in the brief. It's sometime in the 80 or 84 period. And then there's Ross Perot. But then there's also the increase in population. And you could say, well, it's relative, but it is relative in that it's the same percentage, perhaps. But it costs a lot of money to go out and canvass and get these people to sign up, you know, if you're trying to get the signatures. And with the increase in population, you used to have more and more people. It's more and more costly. So, is something that worked in the 1980s the same thing that works in 2019? Well, you had California as an enormous state. It's been the biggest state in the union for over almost 60 years. You had lesser technological means of reaching voters in the past. So, we you know, if you're going to look at the statute as it's been applied, if you even if you want to discount the six people who made it, including Perot, who didn't do it with money, that's undisputed. He did it with volunteers. He didn't spend his own money. You could also look at the rest of the country and say, well, where has there been an independent candidate that got on the ballot everywhere else but not California? You don't have an example of that. Right? So, there have been, I think, two in recent times, Nader in 2004. But he was very damaged goods because he was seen as having given the election of 2000 to President Bush. He just he couldn't get voters. He tried. He couldn't get voters to sign his petition in 2004 in California. And that is I'm not sure that argument, leaving Mr. Nader aside, who of course was decried as a spoiler, but leaving him aside, I'm not sure just because you don't have the independents in some other states that that validates what California is doing. It could mean that it's an equal opportunity problem here that all these states are making it very, very hard to qualify. Well, there's no equal protection clause. No, I'm not saying it in a legal sense, but I'm just saying it doesn't show you anything evidence wise. Well, if you're going to try to look at the evidence, if you're going to say that the California law imposes an unconstitutional standard, but there's nobody that you can point to who tried to get on the ballot who didn't, who actually had a significant modicum of voter support, then you haven't proven the case. It's not our position to prove that. It's the plaintiffs. And they haven't. They mentioned the gentleman from the Marine who ran in 2016, but he didn't even announce his candidacy until August when the signature gathering submission deadline was over in California, even though California is one of the latest of the states. Two-thirds of the states have their submission date for independent signatures earlier than California does. So it's not... Your point about proportionality I think is very important. Just because it's hard to get on the ballot in California doesn't mean that it's an unconstitutional burden. California has 40 million people, 20 million voters, 55 electoral votes. Mr. De La Fuente, by his own admission, did gather 200,000 signatures elsewhere. He just decided not to go for it here, although he had the funds to do it. If he had had volunteer support, he wouldn't have had to dime, which is what happened with Ross Perot. So the... To sum up this point, the showing on the burden, which is entirely the responsibility of the plaintiff, has not been met. Even trying to look at candidates who didn't get on the ballot, he doesn't have any evidence of somebody who actually went out there and tried to gather signatures and couldn't do it because the burden was so high. He doesn't have an example of that. And so if I may move on to the presentation about interests, again, we are not relying only on ballot clutter. And that is one of the interests that we're relying on. But we're relying heavily on the function of winnowing the candidates. It is something that could make a voter frustrated or sap the enthusiasm to vote to see that a candidate like Mr. De La Fuente, who ran as a partisan and lost, is now back on the ballot in the general election. Why was that person not eliminated in the primary process? Well, we have — we don't have a sore loser law in California, which we could. Those have been upheld. We don't say if you run in the ballot for sure. California still allows a person in that situation to get on the ballot if they can prove that the voters are interested in them. Asking for 1 percent of the registered voters in a gubernatorial election to say that they just want you on the ballot, there's no restriction on who can be asked. You can ask a Democratic voter. You can ask a Republican or a Libertarian. You have a large amount of time, 105 days to do it. You have a deadline to submit your signatures that's in the top third in terms of easiness of the states. So should it be hard to get on the general election ballot in California for president? Yes, it should be somewhat hard. Is it going to cost some money to run for president of the United States? Of course it's going to cost some money. The question is, is given the 55 electoral votes at stake, is California posing a very severe burden on ballot access? And that is something that the plaintiffs simply have failed to show. This does bleed into the last part of the analysis, which is the means fit framework. These interests do justify the particular requirement that California has. Again, we've got, we've got Jenner's case showing that 5 percent for, of the registered voters was, was unproblematic. We've got the Nader case versus Cronin, the Hawaii case from the Ninth Circuit, which was a 1 percent requirement based on the vote, not the registered voters, but the vote in the last presidential election. That gave the Ninth Circuit no pause at all. The Ninth Circuit just said, that's, we don't see a problem with that. It's an exactly analogous or a very similarly, let me take that back, I don't want to be too absolute, a similarly analogous burden. Yes, you have to gather fewer signatures in Hawaii, but you have fewer voters to gather them from. 1 percent of any number is, it's a small percent. The raw number may be high, but again, you have to consider that you've got an enormous pool of voters to go to. I wanted to address a few of the points that were, that were made by Mr. Rossi. So Mr. Rossi said that Winger's evidence about 5,000 being sufficient in any election to avoid ballot platter is uncontested, is not true. I don't know why he said that in his briefing. We pointed it out. There was an expert witness on our side, Colleen Kelly, a statistician who, a real statistician who, you know, pointed out that Mr. Winger didn't use any statistical method at all. He then admitted at deposition that he just says, I've been studying these numbers, it's not intuitive for me. So we rebutted that point entirely, that 5,000 would be sufficient for, for lack of ballot clutter. Then they changed their argument after we, you know, they changed their argument, including on the appellate briefing. The, the fact that the legislature in California may have changed the number of signatures to get on a primary relevant here. If it's a little bit easier to get in a party, be nominated through a party process versus being an independent, there's no equal protection clause claim here, and there's no case law that says that the burdens have to be exactly equal between winning a party primary and being an independent. Both of them do put a significant hurdle to general election ballot access, but it's for the same reason that only the candidates that the voters have shown interest in should be on the general election ballot to avoid confusion, frustration, apathy. Again, I do want to rebut the point about Ross Perot that only rich people can run for president. The unrefuted evidence in the record, the historical record is that Ross Perot did not pay any signature gatherers. People were excited about his candidacy and put him on the ballot through volunteer efforts. He collected by one news report over 500,000 signatures in California, which is going multiple times over the requirement, which shows that if you are an independent candidate that the voters are interested in, you can get on the ballot. Mr. De La Fuente also says he doesn't want to give up the cloak of independence, but he ran for president as a Democrat, as an American Delta Party candidate, as a Reform Party candidate, and as an independent candidate in 2016, and he's also said that he's going to run as a Democrat and as a Republican in 2020, and then if that doesn't work out, he'll run as an independent. So he's not the best person to be making the argument that you want to keep the cloak of independence at all times. Just going through a couple of other points here. Right, again, to the extent that, that Mr. De La Fuente is now saying that if there's a difference in burden between getting on the ballot through a party primary system and through a independent petition gathering system, it's not a claim that he's made. He abandoned his Equal Protection Clause claim in the briefing, and I believe he should not be allowed to revive that if that's what he's attempting to do right now. So again, I just want to emphasize that objectively, 1% of the registered voters in the last gubernatorial election, that is less than a significant modicum of support. If a candidate really has that and wants to run as an independent, that candidate can make it onto the ballot in California. It's been done six times since this law was in effect, including in older times when reaching out to voters was more expensive because of mass media and communications or in a less developed state, and we haven't seen any evidence that people can't get on the ballot in California the way they can in other places, which is a point of contrast with the Georgia case, right? The Georgia case was one where there were no third parties, the Green Party, getting on the ballot in Georgia. That's a problem that we don't have in California, and I believe Judge McKeon pointed that out. So, in conclusion, I think the burden hasn't been shown, the interests that have been shown are sufficient, and the means and framework is reasonable in the circumstances. I'm prepared to yield the balance of my time unless the Court has further questions. MS. MCKEON No, I think not. Thank you. MR. BOUTROUS Thank you. MR. MCKEON Let me just quickly address, with respect to the Georgia case, the appellees are wrong. The Reform Party was shown up on the Georgia ballot, the Libertarian Party, and the New Alliance Party. That's just a misstatement of fact with respect to Georgia. Let me get to the standing argument. Williams v. Rhodes, Socialist Labor Party had standing to challenge Ohio's restrictions on minor party access to election ballot, even though they had not filed any petition signatures. Same for Storer v. Brown. Platt v. Perot, a commissioner, plaintiff ran for office in 2014, but not in 2016 and 18, but panel ruled he had standing because he had the right to run in future elections. MR. MCKEON I think he does have standing. I was just surprised the district judge didn't make the finding of standing, because that's preliminary to jurisdiction. MR. BOUTROUS I agree, Your Honor. I just wanted, given the word standing was raised, so I wanted to, I was prepared to address those issues. Della Fuente has announced his candidacy as an independent candidate in 2020. There was a time when he sort of was, he was thinking about running, he doesn't like Trump, he was thinking about running against Trump in the Republican primary, but he has affirmatively decided and announced he's an independent candidate in the 2020 election. He has the mantle of independence. With respect to JUSTICE GINSBURG On the numbers, Mr. Eisenberg said that the numbers that were suggested in the district court at one point in terms of a threshold were 5,000, and then they offered up a number that you think the evidence supports that would be a threshold number. MR. MCKEON I believe the evidence suggests 5,000 is that number. However, we recognize that the courts have equitable leeway here to go above 5,000, because ultimately once this law is ruled unconstitutional, the state legislature will set the number. And hopefully they will set the number in line with what the court, and recognizing what is going on across the country. Georgia's signature requirement has been reduced as unconstitutional. Michigan's is preliminarily enjoined. Pennsylvania's was ruled unconstitutional under this analysis that the combined effects of the signature total and the short time period to circulate petitions is unconstitutional. So I think we would be happy with 5,000. We're not going to shed any tears if it's 15,000 or 30,000, given the size of California. But it's just that we're dealing now with remedy, and we're not at that point yet. We're just on a motion for summary judgment, and we're going to... JUSTICE GINSBURG Well, I mean, it matters in the sense that you have to look at the evidence to look at the burden, and he's suggesting that Winger was not using statistically appropriate evidence. MR. BROWNLEE Well, let me address that. It's a direct analysis. Every state either sets the number of signatures or has a formula. That number is knowable, and then he has then shown what proportion of the electorate that that number translates to, showing how out of proportion California's is with respect to the burden. And then he also, his expert testimony shows that in the history of the United States, when a state has a 5,000 signature requirement, there has never been ballot clutter under Justice Harlan's formulation. And Justice Harlan's formulation has never been criticized by any court. It's generally assumed that eight candidates does not equal ballot clutter, and what Winger has shown is that there is no ballot clutter above 5,000. Now, Georgia set it at 7,500 because they sort of wanted to, you know, give the legislature some room and not be too lenient. Pennsylvania went all the way down to 5,000. Michigan went all the way down to 5,000. But California is a larger state. So, but the evidence suggests 5,000 is sufficient to prevent ballot clutter and voter confusion, and that evidence is not contested. They have not shown that Winger was incorrect in any of his factual assertions in his declaration. That's, in that regard, it is not disputed. I was just a little curious, in the cases that you cite, you cite two out-of-circuit cases and then some district court cases. None of them were opinions. They were all unpublished. We do not consider them precedential. And, as a matter of fact, you're probably aware that there's limitation of citation in the brief, which I'm not sure should have been cited. What is your best case that's a real case, that is not an unpublished one, but a published opinion? What is your best case to rely on? Well, Pennsylvania is a published case. Case. Green Party of It's not an unpublished disposition. No, no, no. Green Party of Pennsylvania. It was the Constitution Party. I'm sorry. I'm getting my party's name wrong. Constitution Party of Pennsylvania lowered the signature total down to 5,000 in reliance of Winger's testimony. That's a published case out of Pennsylvania, Third Circuit. What court was that? Out of the Third Circuit. Eastern District of Pennsylvania and then to the Third Circuit. District Court case. District Court and then the Third Circuit affirmed. Also, he makes quickly, you don't have to have volunteer support to show modicum support. It's a constitutional right to use paid circulators. Almost every presidential candidate, certainly an independent candidate, and frankly even major political party candidates use paid circulators nowadays because it's just easier. And Judge McEwen, your point was on spot where just because somebody hasn't appeared on a ballot in all 50 states, there are a whole host of ballot access regulations and restrictions that are, it's a patchwork. Different states impose more difficult requirements in some respects so that you couldn't get onto the ballot. That was the instance in the system that was difficult in combination with the signature requirement. And so you're right. Just because you're not on 50 state ballot doesn't mean you couldn't have had there been a constitutional landscape. And we are trying to chip away at that one state at a time. It takes time. Thank you for your argument. Thank both of you for your arguments today. De La Fuente v. Padilla is submitted and we're adjourned for the morning. Thank you.
judges: Wallace, Tashima, McKeown